I intend to reserve about five minutes of my time and I will watch my own clock. The briefs in this case present four questions regarding the meth trial in this case. My plan for today is to start with the public trial issue, cover the prosecutorial misconduct question, and then of course address any questions your honors may have. In terms of the public trial issue, this court's decisions have significantly narrowed the questions that are open for this court to decide. The court's decision in Allen held that closure of this type does affect the public trial right, that there are more narrowly tailored options that are available to the court, and that the first and second prongs of the plain error standard are met under Allen, that the third prong of the plain error standard is met under Becerra, this court's case that held that where there is structural error there is necessarily an effect on the defendant's rights. And then what is left for open after Allen and Becerra is the fourth prong and of course the government's argument that we're out of plain error altogether and that this is waived. So those are the two questions I plan to address. So on the fourth prong of the Olano standard, I mean the Supreme Court has said that we're never obligated to notice a plain error, there's always discretion at the fourth prong if the three elements are met, and then of course the Weaver case suggests quite clearly that there are contexts in which what are otherwise structural errors don't really result in a fundamentally unfair proceeding in a way that would implicate the fourth prong. And so why don't we still have discretion at the fourth prong? You of course do have discretion but here I think you should exercise that discretion in Mr. Mayo's favor for two reasons, some which are kind of general to the public trial right and a couple that are specific to this case. So I start as Becerra did with the recognition that the interests that are in consideration under the fourth prong are similar in many cases to the concerns that would lead an error to be structural. In this case there's a direct mapping of the two. The fourth prong of the plain error standard looks at both the fairness of the proceeding and the appearance of fairness. And Press Enterprise says that those are the exact two same things that we're looking at in terms of why the public trial right is so important. Without rehearsing that I think I want to go specifically to the ones that are individual. So you're not contending that the Ramirez-Ramirez case eliminates the discretion the Supreme Court has said that we've had at prong four? I don't think it eliminates that discretion. What I think it does say is that if, a couple things, one, if the fourth prong was met there it seems a strong case that this is a more fundamental intrusion on the public trial right. And so if that one necessarily impacted the fourth prong, this one does too. I also think, again, the reason that it was so easy for the Ramirez-Ramirez court to say that the fourth prong was met is going back to that consideration in Becerra. That the same things that would lead the error to be structural are ones that would counsel in favor of finding the fourth prong. I do want to emphasize, I think this is a particularly egregious public trial right for public, intrusion on the public trial right for two reasons. And one of those is the fact that jury selection here was held in a locked down military facility. Even if something happens in a courthouse where the courtroom door is closed, the knowledge that it's happening in a public location, that there are individuals who are coming around, that it's not in this kind of locked down facility that's away, and particularly again the military, the fact that it was a military facility, I think would affect the public reputation. It was audio to the public, correct, during the voir dire? There was an order at 235 the day before that said that if you want to listen in, you can call the clerk's office. Now, I think other comments during the trial suggested that most of the clerk's office was at the National Guard facility so that they could, I mean, the clerk's office in Guam is, I think, two people. Do the records say anything about whether or not anyone tried to call in or did call in? It does not, Your Honor. It doesn't reflect that. So, the audio, I mean, I don't think that was a particularly calculated way to make sure that the public still had access. It's not a total closure. I mean, it's a provision of visual observance of it, but there is still audio. It's something, Your Honor, but again, I think what Allen says is that there's... Allen didn't involve a total closure in that respect, did it? Allen involved... There was an audio feed in Allen. It was the same as here, I believe. And so, I think the same things that the court recognized in Allen are present here, right? An audio feed is something, but it doesn't allow you to see the court or the other individual's visceral reactions. It wouldn't allow them to see anything that was up on the screen. It wouldn't allow you to hear the body language of what the jurors were answering or any of those other things. So, it doesn't fully take the place of a video feed or presence in the room. Of course, neither your client nor the counsel ever objected to this manner of proceeding in any respect. That's true, Your Honor. The court issued a sua sponte order the day before trial closure after having said many times in the four months... It was right about to go to trial, right? Four months before it actually went to trial. During those proceedings, the court said, of course, the public's gonna be welcome. We're gonna make sure the media can be here and all those things. It was only the day before trial that this order went up on the docket. I don't think it's entirely clear that Mr. Mayo knew that the order was on the docket, right? Because, you know, it comes out 235. There's no... It was never discussed on the record. There was no... His counsel's charged with knowledge of what's on the docket. His counsel is... Yes, of course. His counsel should have objected, and that's why we're in plain error instead of... With respect to the hallway interview, you know, it's essentially a hallway sidebar. So there the issue is the fact that he wasn't personally there. That's true, Your Honor. Though I do think when you consider the fourth prong for the public trial error, you could also consider in that fourth prong the impact it would have on the jurors to see, basically, you know, 24 of their cohort be pulled off into a hallway and disappear. Those jurors didn't know... You know, they were the only public that was... That's not different from doing 24 sidebars. Well, I think it... So in Reyes, the court talks about the fact that even though it was held outside of the defendant's ability to hear, he was still present. He was still able to see what was going on. He saw how long it was going on. He watched facial expressions. And that was such a short conversation that, of course, his attorney was able to come back and the court was confident that he would be able to convey all of the nuances of that discussion. And I would say also in Reyes, the court pointed out, and it was important to the court, that no juror was actually removed from the jury during that sidebar session. And so I think that also makes a slight difference. We've had cases like Bordallo where the defendant isn't at the sidebar when someone is removed for cause. And we've said that that's subject to harmlessness. And you look at it and you say, well, that person obviously had to be excluded. And having a defendant present wasn't going to change that this person had to be excluded. I agree. And I think that's why of the two claims, the right to presence one is the weaker one than the public trial one. I agree. What I'm simply saying is that when you look at that fourth prong, I think you can also consider the fact that there was a full third of the proceeding that was not even held in that quasi-public space of having at least other jurors around. The jurors, from their perspective, would have seen people simply pulled off into a hallway and then disappeared from the jury altogether. A full third of the jury disappeared that way. And I think that, too, contributes to the public trial error, at least in terms of the fourth prong. Yes? Discussing the fourth prong, I'm sure you would like to say if all four prongs are met, then we should reverse. Yes. But you can see there, we still have some discretion. What are some instances where all four prongs are met, but you would say, no, a court may be in a good position not to reverse? Another way of saying why is this different from certain situations where even though all four prongs are met, a court could exercise its discretion not to reverse? Sure. I mean, the one that the government mentions that comes to mind is the missing elements issue where there is plenty of evidence on that missing element. The language from Al-Firahin, I think it says, look, in that case, the greater threat to the public reputation of the court is to force everybody to go through a second trial where the only error is the missing element and the element was more than met. And so we have no doubt. In this case, I think what makes it different is the fact that the government points to what it views as strong evidence. I would quibble with that, and that leads to the prosecutorial misconduct one, which I see I'm already into my rebuttal time and haven't gotten to, but that the strength of the evidence doesn't meet the error in this case. No matter how strong the evidence is, we're concerned about trials that happen in secret and portions of trials that happen in secret. And so that's why I think this case is different. I might take a minute. I know I'm into rebuttal, but I do want to quickly address the prosecutorial misconduct question. To me, and I understand that prosecutorial misconduct sometimes in the eye of the beholder, but to me, this is a clear example of a prosecutor overstepping her boundaries in her cross-examination and in closing argument. The government's response to that is to defend the question. To me, again, I just don't think that prosecutors can come and say that their star witness didn't stand to gain much from her testimony. Then it comes down to harmlessness. The government says the error is harmlessness because of the instruction, but to me, the instruction only makes the error more egregious because it would have told the jurors that they should consider Ms. Mendoza's stake, and of course, the government had said that she had no stake or very little stake. Of course, the terms of her plea agreement were put on the record, and she was questioned at some length about those, correct? She was, Your Honor. Then the jury was instructed that the arguments of counsel are not evidence. That's true. I mean, the comment is, at a certain level, the comment is so self-evidently wrong that the juror which has the terms of the agreement presumably can see for itself and assess the significance of it. It seems like a clear overstatement. I think it's egregiously wrong to you and I. I've been doing this a long time, and I understand how plea agreements work, and I understand how cooperation works, but the line, and the case name escapes me for the moment, but that evidence matters, argument matters, and prosecutors' arguments matter most of all because if the jury doesn't understand how plea agreements work, they're likely to take the word of the prosecutor who said, here's the witness, and she doesn't stand to gain much. That is far more understandable than understanding how these various terms of the plea agreement would have interacted. I would like to reserve two and a half, so if there's not urgent questions on that, I think I'll let my opposing counsel speak. Thank you. All right. We'll hear now from Mr. Rotker. Yes, Your Honor. Thank you. You may proceed. Good morning. Michael Rotker on behalf of the United States. Like my opponent, I would like to begin this morning by focusing on the public trial claim. Now, in our brief, we've set forth three independent grounds for this court to reject that claim         The eighth is the fact that it's not a plea. The ninth is the fact that it's not a plea. The second is if you reject our waiver argument and proceed to apply plain error, while we concede their first two prongs were met. When you say waiver, do you mean invited error? It's an affirmative waiver because he remained silent in the face of knowledge that he had this access to a public trial, right? That during the pretrial proceedings in this case regarding the jury selection, Mr. Mayo and his counsel were repeatedly advised. Generally, to get out of plain error, haven't we generally required something that's more like a knowing and conscious voluntary waiver of a level that inaction doesn't normally mean? Well, the Supreme Court has said, and we've cited Bergke's versus Tompkins, and there are other cases in our brief that you can have an implied waiver, and the defense has not disputed that silence coupled with knowledge is a sufficient basis for finding an implied waiver. Now, here, there's no question that they remain silent. The only question is knowledge. And I would respectfully submit that if you look at the pretrial transcripts in this case when the district court was discussing the conduct of jury selection, on page 27 in the second volume of the excerpts of record, the district court in Mr. Mayo's presence specifically said, the public media, I don't know if Mr. Mayo has any family members that want to come for jury selection or anybody in public, but we have to make sure that the constitutional rights of the public and the defendant are not violated. At a subsequent hearing, and I'm going to be quoting now from volume two, pages 81 to 82, again, in the presence of Mr. Mayo, the district court specifically said to Mr. Mayo's counsel, I don't know if Mr. Mayo is going to have any family members come in for jury selection, probably not, or you don't know. The defense counsel said, I don't think so, Your Honor. It's very difficult, I think, in the face of those acknowledgments and those colloquies for the defense to argue that they didn't have knowledge. So our position, and particularly in light of the Supreme Court's decision in Levine, which doesn't require the sort of depth of knowledge that the defense is claiming is required, that there has been a waiver. But let's put the waiver issue to the side. Let's assume that the court disagrees and proceeds to analyze this as a forfeiture under the plain error standard. We acknowledge that there was error, and we further acknowledge that it was plain. We don't agree with Mr. Mayo that the third prong has been satisfied because we think that waiver abrogates this court's precedence. Well, but doesn't Ramirez, Ramirez say that the third prong at least is met? Well, Ramirez, Ramirez says that, and so does Becerra, the case that they say. The problem is that waiver fundamentally changed. Our case law is very clear in Miller v. Gammie on Bonk that we cannot reach back to an older Supreme Court decision to overrule a more recent three-judge panel opinion. And so if Ramirez, Ramirez says that the third prong is met here, then we can't use waiver to deconstruct that. Respectfully, I think that you can, Your Honor. I don't want to spend too much time on the issue. I mean, the issue is laid out in our brief. The one thing that I would say is this. Becerra was, and Ramirez, Ramirez, were both decided after Weaver. But the problem is Becerra in particular, which is the lead case they rely upon, it contains no independent analysis of how Weaver redefined the term structural error to say it only applies when the error has been preserved. And by the defense's own admission, this is an unpreserved error. So the problem is that Becerra never grapples with Weaver. It never addresses Weaver. And I think there's a clear irreconcilability. And what I found perhaps most telling from the defense reply brief is they don't attempt to defend this court's approach. They don't say that our reading of Weaver is wrong. They simply say, look, if the government thinks it's wrong, it should seek rehearing en banc. Well, that's an option. But as Your Honor pointed out, in cases of clear irreconcilability, we don't have to resort to the cumbersome and time-consuming en banc process. But your opposing counsel has conceded that the discretion still remains at the fourth prong, even after Ramirez. So why don't you talk about the fourth prong rather than— And that's exactly where I wanted to go. I just wanted to preserve our position that we think that the cases are wrong. Whether the court chooses to reach that issue, that's up to the court. On the fourth prong, the court does have discretion. I heard defense counsel to acknowledge as much. So then the only question is, what are the factors that should inform the exercise of that discretion? And in our brief, we identified a list of five independent considerations that we think counsel—that make this not one of the rare and exceptional cases where the court should exercise its discretion. The first consideration, Your Honors, is the overwhelming nature of the evidence. And I think if you look at the Supreme Court's decision in Johnson and you look at Cotton, it makes clear that the overwhelming nature of the evidence is a relevant consideration under the fourth prong. Here, you have three cooperating witnesses who testified against Mr. Mayo. They testified largely in materially consistent ways that Mr. Mayo was a drug user, a meth user. They acknowledged that he was part of Ms. Mendoza's drug operation. And they also testified to his involvement in the events on the day in question where he was going to hot potato the package. On top of that, you have contemporaneous text messages between the co-conspirators that corroborate their stories. And perhaps equally importantly, the jury only needed a couple of hours to deliberate, suggesting that they viewed the evidence in this case as overwhelming, they weren't troubled by Mr. Mayo's defenses. That fact in particular is one this court has previously identified as an objective indicator that the evidence is overwhelming. And so we think the overwhelming nature of the evidence is one that counsels against rectifying the error. I'm going to deviate and go a little bit out of order from the five considerations as they're laid out in my brief because I want to get, Judge Collins, to your point about the audio feed and the significance of that and to try to clear up what I think what the government thinks are a couple of misapprehensions. It is absolutely correct as a factual matter, and I'm not suggesting defense counsel disagrees, that there was an audio feed. But if she points out there was an Allen too. Yes, but Allen was a preserved error. There was an objection. That's why Allen is different. So the point of the audio feed is not that it negates the error. We're not denying that there was still an error despite the audio feed, but what the audio feed does is it mitigates the extent of the harm. And here's why. The purpose of the public trial guarantee, because the audio linked further to a number of the values that underlie the public trial right. And here's where I think perhaps some of the misconception comes into play. The public trial guarantee is not an assurance, a substantive assurance that anyone is going to come and actually sit in the courtroom or in this case, listen to the feed. It's simply an assurance that those who wish to do so are afforded an opportunity to do so. And if I can give a simple hypothetical that I think will illustrate this point very clearly. Imagine we're in a pre-COVID world or even today in a post-COVID world where largely concerns are mitigated, right? The district court then convenes a jury for jury selection. The courtroom is open to the public. Anybody can come and go, but no one chooses to attend. Does that mean the defense was denied a public trial simply because no one attended? No, of course not. It simply means that the opportunity existed for anyone who wanted to come. And that's, I think, the fundamental misconception. It's not about whether anyone actually came. It's the knowledge of the participants that they were subject to public scrutiny because of an audio feed or, in my hypothetical, an open courtroom. That's what promotes the values underlying it, and that's why I think the significance, the audio feed, cannot be minimized. Again, just to reiterate, we're not claiming that the audio feed negates the error, but it is an absolutely relevant consideration that counsels against rectifying this error. Going back to the fourth line of fact, the discretionary factor, we're supposed to look at whether the error seriously affects the fairness, integrity, or public reputation. Kind of get the fairness point, but isn't closing a public trial, doesn't that affect the integrity or public reputation? Well, I think viewed in the abstract, it doesn't automatically, and I think that's what the Supreme Court said in Weaver. I know it was a different context. I'm not claiming it's directly controlling, but I think the logic of Weaver is that, look, closure errors are significant, and they implicate significant values. On the other hand, this was rather right or wrong. This was not done arbitrarily. The district court had a rationale for doing that. Now, it erred, and we now know that it erred. We're not disputing that it erred, but that doesn't inherently vitiate the fundamental fairness for a couple of other reasons as well. First of all, the trial itself was, there was greater access to the trial, so we're only talking about the jury selection proceedings. So that's one component that I think mitigates the harm. The other issue, which I think makes this case somewhat unusual, is that the defense has never, they never identified a single person who they claimed wanted to come to the jury selection proceedings, but was shut out. And I look back through a lot of the precedents on this point, even Weaver itself. In Weaver, it was the defendant's mother and her minister. And they wanted to come in, and they weren't allowed. And that's what, they were excluded. Here, there's no claim, and again, I refer to the court, to the colloquy that I read earlier, where Mr. Mayo's counsel didn't identify anybody that wanted to come. So this is a case where... It's not limited just to family members or friends. I mean, it could be just a member of the public. It could be, but... There, you really have no idea, and it's impossible to figure out if there was some member of the public who would have gone. That's right. Well, sure. But what this court said in its decision in Rivera, which is cited in our brief, is that yes, it is a public trial right. But the particular concern is with friends and family. And so when they haven't identified any friends or family, and they didn't say they wanted anybody to come, again, we're not talking about the merits of the question so much as how does this factor inform whether or not this court should exercise its discretion. And we think this is a thumb on the scale that counsels against exercising that discretion. And I believe I've covered four of the five factors. I think the only other factor I just want to mention, which is referred to in our brief, is based on the Supreme Court's decision in Molina-Martinez. And Molina-Martinez said that courts of appeals can be more liberal in exercising their remedial discretion when the effect of the remand is limited in terms of the district court's resources. So what they were talking about there is there was an error in calculating the defendant's guidelines range. And the Supreme Court said, we're okay with more liberal use of the discretionary authority because it's a limited burden on the district court. And the court specifically contrasted that outcome with a case where a remand would require the empanelment of a new jury. And I think just as a sidebar, I think the reason the court said empanelment of a new jury is they were talking not only about jury trials but also capital sentencing proceedings where a new jury might have to be convened. But the point is still the same. This is a case where the remedy would be more burdensome. And it was a six-day trial. There were a number of witnesses who were called. There were a number of government employees, the co-conspirators. It's not inconsequential. We're not saying this was a three-month-long trial, but it's also not a remand for resentencing. That is also a thumb on the scale that counsels against this court reaching out and using this case as one to exercise its discretion to remedy this kind of error under these circumstances. If the court has no further questions on the public trial issue, let me turn just briefly to a couple of the remaining issues. On the question of Mr. Mayo's absence from the hallway conference, we think this case is materially indistinguishable from the Supreme Court's decision in Gagnon. In Gagnon, the district court judge in open court said that it was going to hold a chambers hearing with counsel and one of the jurors to investigate an allegation that had been made against that juror. The defense attorneys went into chambers, but the defendants sat quietly in the courtroom. They didn't ask to go, and they didn't go. When those defendants later claimed they were denied their right to be present at that hearing, the Supreme Court said, no, you waived your right. You sat by silently. You were in the courtroom when the district court made that announcement, that it was going to hold that hearing, and you chose not to say anything. I apologize for continuing to hit the microphones. I think that the facts of this case are materially indistinguishable. Mr. Mayo was present in the courtroom, the makeshift courtroom, during the jury selection proceedings. He was there in person when the district court announced it was going to hold this hallway conference, and he chose to sit by and not say anything. Now, I want to clarify, the defense has suggested in their reply brief that there was a statement by the district court that was kind of like an instruction to Mr. May put, and that he wasn't allowed to leave the room. I have a very, the government has a very different interpretation of that, and I'm reading from page 228 in volume two. After the district court talks about how it's going to go out in the hallway, it says, if anyone needs to use the restroom, my clerk can take, and this is about the veneer members who were in during the break, the rest of you can stand up, stretch, whatever, here in this room, all right? So we'll probably be back. I'll try to move it probably about 30 minutes. I don't interpret that, and I don't think that's the intent of the court was to say to Mr. Mayo, you're excluded from the hearing. I think the court was just saying, we're going to hold this hearing in the hall. We're in this NRGC, this secure facility. If anybody wants to stand up and stretch, just do it here in this room. I think Mr. Mayo, as an adult, has a voice. He is also represented by two lawyers who, as Your Honor pointed out, are his representatives, his agents who are capable of speaking on his behalf. Can you address the prosecutorial misconduct issue? Yes. Because there was a lot covered about her agreement at trial, and she was questioned at some length. Right. And to make the comment, so she doesn't really stand to gain a lot from her testimony against Mark Mayo, it's almost self-evidently absurd to make such a statement. I mean, obviously, she wouldn't be there cooperating with them if she didn't expect some benefit from it. And she was crossed on that subject. And to make a comment like that seems absurd. I guess I have a couple of observations, Your Honor. First of all, just from a contextual standpoint, that is not the full extent of what the prosecutor stated. The prosecutor's comment had a second clause at the end of it. She didn't say— No, I know. But she stands to lose a lot if she lies. But in some ways, it's worse because it says she gets no benefit when that was—seemed hard to square with what's in the agreement. Right. And then it's only, you know, if she lies with sort of the implication that, you know, the prosecutor's going to make the judgment whether she lied. I'm out of time, if I may. Yeah. I just want to be respectful. Thank you. I think that, Your Honor, if the government had—let me just answer starting with a hypothetical, and then I'll be more direct. If the government had said she stood to gain nothing, I think we'd be in a difficult predicament. But remember, this is a rebuttal-closing argument. And I think it's a fair inference, right? It's not a self-defining term. A lot? How much? These are kind of open-ended, subjective comments that I think even defense counsel said it's in the eye of the beholder. And I think for purposes of argument, when defense counsel comes in and says she has all this motive and incentive to testify falsely to curry favor, I don't think it's unreasonable. I certainly don't think it's so clearly unreasonable because, remember, we're on plain-error review. I don't think it's so clearly out of bounds for the prosecutor to say, look, the defense wants you to think she stands to lose a lot, but as the district court is going to instruct you, you also have to look at the other side of the ledger. What does she stand to lose if she lies? Because the government made it very clear during its redirect examination that Mendoza understood that her eligibility for a sentence reduction depended on truthful, honest, and complete testimony. So the government, I think, was entitled to fight fire with fire. I don't think this is a case where the government struck a foul blow. I think they struck a hard blow, and they were responding to an attack that the defense opened up on the credibility of its witness by saying, look at both sides of the ledger. What does she stand to gain? In the government's view, maybe your honors wouldn't agree with it. Maybe I wouldn't agree with it. But the prosecutor, I think it's fair for the prosecutor to put that out there for the jury and say, in our view, she doesn't stand to gain a lot, and look at what she stands to lose if she lies. Is that vouching? Yeah. I don't really – the defense hasn't called it vouching. And when I was briefing the case, I was looking to try to pigeonhole this. And I don't – they're not really saying that the witness is credible. They're saying in judging her credibility, you have to look at both sides of the ledger. And that's how the district court instructed the jury. The government didn't say, look, she is – If you claim a vouching, I'll withdraw my question. No, no, no. It's a fair question because I didn't know how to characterize it either. It's more a question of I think that the prosecutor was misstating the record or asking improper questions. But I don't view this as a traditional vouching-type claim. I'm well over my time, and I'm happy to answer any other questions. But if not, we would ask the court to affirm the judgment. And I thank the court for its patience. Thank you, counsel. All right. Since we allowed your opposing counsel to go for two and a half minutes, we'll give you the five minutes you had wanted for rebuttal. All right. I'll start where my opposing counsel left off. I just don't think there's any way you can say Ms. Mendoza didn't stand to gain a lot under any definition. She had a 10-year mandatory minimum hanging over her head. She was serving a sentence for another case. At the end of the day, she walked out better for having imported this 10-year mandatory minimum quantity of drugs than she would have if she had never arranged for this transaction because she ended up with fully concurrent time here. She ended up with a sentencing reduction in her other sentence. And so I just don't think it's a fair way to characterize what the stakes were in this case. She stood to gain a lot. She stood to gain a lot from her testimony, and she got a lot out of her testimony. I simply don't think there's a way to say that that's fair in context. Both of these questions relate or the court is going to consider and the government return to it the overwhelming evidence, what the government claims is overwhelming evidence. I would agree that if you believe everything Lavellia-Mendoza said, there was overwhelming evidence. But a lot of what the government points to in terms of this overwhelming evidence is stuff that wasn't disputed. It wasn't disputed who did what and where and where they went and who picked up and went. None of that is disputed, and yes, there was overwhelming evidence of all of that. What there was not overwhelming evidence of was Mr. Mayo's knowledge of the package. And so what we have was Beau Roman, who said he didn't meet or talk to Mr. Mayo until after the incident. We have Dan Pagelanen, who said, well, I didn't tell him what was in the package, but that's because Ms. Mendoza did, so that doesn't really help. We have the fact that this is what this group of guys did together, except Mr. Mayo was never involved in the kind of upstream preparation or retrieval of packages. It was undisputed that he was a street-level seller and a user. He wasn't the person they went to to go and pick up packages or to cut or to hand out the packages to other members of the team. And that, I think, cuts against his knowledge. And then you have this ambiguous statement that he made that the government's agents admitted they didn't clarify whether he was saying that he knew it was probably meth at the time he was interviewed, after he knew he'd been charged with a drug offense or before. And then the last piece is what the government calls the cloak-and-dagger aspect of it all. I think just given how much other stuff and illicit stuff this crew was involved in, it's impossible for that alone to carry the weight of overwhelming evidence. And so I'm happy to address that question, or I can go back to the public trial question. Okay. So let me start with, you know, my view is that the government's putting too much weight on the existence of the audio feed. Because it came so late, and because it wasn't, you know, and I would contrast it. If somebody wants to, including my client's family, if my client wants to watch this argument today, they go to the web page, they see the link, they know exactly how to log in, exactly how to get there, there's no calling around. This was a situation where at 2.30 the day before, they said, if you want to listen in, good luck. Call the clerk's office. We're going to be open for another two hours before the 8 a.m. voir dire starting, right? It would be like if the court said, in the hypothetical that my opposing counsel gave, you're welcome to come to that trial. Here's a scavenger hunt to how to get to the courtroom and which courtroom it's in, right? This simply wasn't calculated to make the audio feed a useful alternative for members of the public, my client's family and other individuals who wanted to attend. Opposing counsel says, well, I didn't ID people who wanted to come. You know, counsel should have objected to this obviously. Counsel should have made a record of the people who wanted to come obviously. At this point, I don't have an avenue to show the people who would have come or wanted to come, and so that's why that's not there. But I do think it's relevant that the family was there in force during the trial, that there were a lot of people who did attend on Zoom, including a classroom of students, including other judges. I think it's relevant that there were members of the media who attended the status conferences in this case. It shows to me that there were people who wanted and were interested in this trial who were not permitted to attend because of the closure order. If the court doesn't have other questions, those were the points that I wanted to cover. All right. Thank you, counsel. I thank both counsel for their arguments in this case, and the case just argued will be submitted.
judges: BEA, COLLINS, LEE